211 Ga. 923 (1955)
89 S.E.2d 881
SCHWARCZ
v.
CHARLTON COUNTY et al.
19008.
Supreme Court of Georgia.
Argued July 11, 1955.
Decided September 13, 1955.
Rehearing Denied October 13, 1955.
*924 Franklin, Eberhardt, Barham & Coleman, O. W. Franklin, Jr., Wilby C. Coleman, for plaintiff in error.
Eugene Cook, Attorney-General, Andrew J. Tuten, Paul Miller, Assistant Attorneys-General, R. A. Sapp, Deputy Assistant Attorney-General, A. S. McQueen, Reese, Bennet & Gilbert, L. J. Bennet, John Gilbert, contra.
ALMAND, Justice.
Doris Schwarcz filed her suit in Glynn Superior Court against Seaboard Construction Company, a corporation with its principal office in Glynn County, and against Charlton County, for personal injuries alleged to have been sustained, by reason of a defective bridge in Charlton County, while traveling over State Highway 23, south of St. George. Negligence was charged against the county for maintaining a defective bridge, and against the defendant construction company on the ground that, while it was engaged in paving a section of the road on which the bridge was located under a contract with the State Highway Department, which had assumed jurisdiction over the road, it negligently failed to place or cause to be placed within reasonable proximity to the alleged defective bridge, a sign, barricade, flare, or other form of notice warning users of the highway as to the existence of the defective bridge. Charlton County, jointly with the State Highway Department as "vouchee," filed (a) a plea to the jurisdiction on the ground that Charlton County alone had jurisdiction over the defendants; (b) general demurrers; and (c) an answer. The defendant construction company filed general and special demurrers. The plaintiff filed a motion to strike the name of the State Highway Department from all defensive pleadings. She also filed a motion to strike the plea to the jurisdiction filed by Charlton County and the State Highway Department as "vouchee," it being alleged that the act of *925 1950 (Ga. L. 1950, p. 62), which provides that all suits against the State Highway Department shall be brought in the county in which the cause of action arose, if applicable in this case, was unconstitutional as being violative of art. 6, sec. 14, par. 4 of the Constitution of 1945. On a hearing, the court (1) denied the plaintiff's motion to strike the name of the State Highway Department from all defensive pleadings and strike it as a party defendant, (2) denied the motion to strike the plea to the jurisdiction, and (3) entered an order sustaining the plea to the jurisdiction filed by Charlton County and the State Highway Department as vouchee. All of the general and special demurrers filed by the construction company, and the general demurrers filed by Charlton County and the State Highway Department, were sustained, and the action was dismissed as to all parties defendant. In a bill of exceptions, the plaintiff assigns error on all of the above rulings.
1. The defendant Charlton County, and the State Highway Department as vouchee, upon the filing of the bill of exceptions in this court, filed a motion to dismiss the bill of exceptions, because the plaintiff in error failed to designate Seaboard Construction Company as a party defendant in error. The plaintiff in error thereupon filed an amendment in this court to the bill of exceptions, in which she named Seaboard Construction Company as a party defendant in error. The certificate of counsel for the plaintiff in error shows service of this amendment on counsel of record for Charlton County, the State Highway Department, and the Seaboard Construction Company. The original bill of exceptions shows that Seaboard Construction Company was a party defendant to the suit, that it filed general and special demurrers through its counsel, Reece, Bennet & Gilbert, and assigned error on the order of the court sustaining the general and special demurrers of the construction company; and the bill of exceptions contains a written acknowledgment of service of the original bill of exceptions, unconditionally waiving further service, by the record counsel for the construction company.
Service of the original bill of exceptions being perfected upon counsel for the construction company in the manner provided by Code § 6-912, it was amendable, under Code § 6-913, "by making any person a party defendant in error to the case who is *926 bound by such service although such person may not have been named in the bill of exceptions." Seaboard Construction Company being a party in the trial court, and its attorneys acknowledging service without reservation on the original bill of exceptions, it may be named as a party defendant in error by amendment in this court. Lassiter v. Bank of Dawson, 191 Ga. 208 (1) (11 S. E. 2d 910). The bill of exceptions having been amended in this case as provided by the above Code sections, the motion to dismiss is denied. Hayes v. Hayes, 137 Ga. 362 (1) (73 S. E. 659); Clinard v. Clinard, 169 Ga. 199 (1) (149 S. E. 788).
2. We next consider the rulings of the trial court in refusing to sustain the plaintiff's motion to strike the name of the State Highway Department from all defensive pleadings filed by Charlton County and the State Highway Department as vouchee, and in refusing to strike the plea to the jurisdiction filed in the name of both of these parties, and further in sustaining the plea to the jurisdiction. The correctness of these rulings hinges upon the right of the State Highway Department, as vouchee, to file defensive pleadings in the case as a party defendant.
In our opinion Code § 38-624, which provides how a defendant having a remedy over against another may vouch such party into court, has no application here, but the case is controlled entirely by Code § 95-1710. Under Code § 95-1001, Charlton County is primarily liable for all injuries caused by reason of any defective bridge within its jurisdiction, whether erected by contractors or by county authorities. The allegations of the petition show that the alleged defective bridge maintained by Charlton County was a part of State Highway 23, over which jurisdiction had been assumed by the State Highway Department, and it had charge of the paving being done on the highway by its contract with the defendant construction company. Code § 95-1504. Under Code § 95-1710, it was the duty of the State Highway Department, when Charlton County was sued, to defend the suit and be responsible for all damages awarded against the county. After receiving notice from the county of the pendency of the suit, it was under the duty of defending the suit in the name of the county, with the right and authority to adjust and settle, in the name of the county and in its own behalf, any claim for damages for which *927 it might ultimately be liable. The plaintiff could not originally have brought this action against the State Highway Department alone, or against the county and the State Highway Department jointly. Hardin v. State Highway Board, 185 Ga. 614 (196 S. E. 40); State Highway Dept. v. Dayhoof, 72 Ga. App. 34 (32 S. E. 2d 860). This Code section provides the only method and manner by which the State Highway Department may be held responsible for damages suffered by one by reason of a defective bridge maintained by a county. State Highway Board v. Hall, 193 Ga. 717 (20 S. E. 2d 21); Davis v. City of Barnesville, 80 Ga. App. 3 (54 S. E. 2d 915). The primary liability is against the county; the ultimate liability is against the State Highway Department. Tounsel v. State Highway Dept., 180 Ga. 112 (178 S. E. 285); Taylor v. Richmond County, 185 Ga. 610 (196 S. E. 37). After the State Highway Department was served with notice of the pendency of the suit against the county, when it came into court to defend the suit it had the right, in the name of the county, to file any and all defensive pleadings to the suit that the county would have had the right to file. Not being subject to being made a party to the suit, it can not defend the action in its own name and raise issues which the county could not raise. If at the time of filing of the suit the court had jurisdiction over the county as a party defendant, such jurisdiction was not ousted by the filing of a plea to the jurisdiction by the State Highway Department or the county, on the ground that the court had no jurisdiction over it. Jurisdiction is determined as to those who are the real or actual parties to the suit, and not by one who is not a party though he may be bound ultimately to respond to the judgment rendered in the proceeding. The act of 1950 (Ga. L. 1950, p. 62; Code, Ann. Supp., § 95-1619), which provides that all suits against the State Highway Department as to ex delicto cases shall be brought in the county where the cause of action arose, has no application here, and therefore we need not consider the constitutional validity of the act, for the reason that this act applies only in cases where the State Highway Department is an actual party to the cause of action against it. Here the action is against Charlton County, which is charged with being a joint tortfeasor with Seaboard Construction Company, which is subject to the jurisdiction of Glynn Superior *928 Court, and may properly be joined in the suit against the construction company in Glynn Superior Court under art. 6, sec. 14, par. 4 of the Constitution (Code, Ann., § 2-4904), which provides that an action against joint tortfeasors residing in different counties may be brought in the county where any one defendant resides. Cox v. Strickland, 120 Ga. 104 (47 S. E. 912, 1 Ann. Cas. 870); Albany Coca-Cola Bottling Co. v. Shiver, 63 Ga. App. 755 (12 S. E. 2d 114).
It follows that the court erred in denying the plaintiff's motion to strike the name of the State Highway Department, vouchee, as a party from all defensive pleadings filed by Charlton County, and erred in denying the plaintiff's motion to strike the plea to the jurisdiction, and in sustaining such plea.
3. We consider next the order of the court sustaining the general and special demurrers of Seaboard Construction Company and dismissing the action against it. In our opinion this judgment was correct, because the petition fails to show that the construction company was guilty of any breach of duty towards the plaintiff that proximately caused, or contributed concurrently with the alleged negligence of the county to, the plaintiff's injuries. The petition alleges that the county built the bridge and approaches on the highway thereto claimed to be defective, and up to the time the plaintiff was injured the county had maintained it as a part of the traveled highway. The defect alleged was that the wooden bridge was below the paved surface of the road as one approached the bridge on the highway, and was defective by reason of an abrupt depression about 9 feet below the paved, traveled surface of the highway, caused by reason of fills and embankments being constructed about 9 feet higher than the floor of the bridge; and that the presence of the depression or sudden decline of the road could not be discovered by a person driving an automobile southwardly, using ordinary care, until it was too late to avoid running into the depression in the road and causing the automobile to get out of control by running into the depression near the bridge. The county was charged with negligence, in (a) maintaining the bridge at a level approximately 9 feet below the level of the paved road adjoining the depression; (b) maintaining on the highway a defective bridge; and (c) not placing near the defective bridge signs or warnings as to the danger of traveling over the same.
*929 The only act of negligence charged against Seaboard Construction Company was "In not placing, or causing to be placed at or near said highway and within reasonable proximity to said defective bridge any sign, flare, barricade or other form of notice, warning those traveling such highway in motor vehicles of the existence of such defective bridge and the dangers thereof in traveling over the same." There is no allegation that the construction company had anything to do with the construction of the bridge or the approaches on the highway thereto, or had done any act that caused or created the sudden depression in the highway near the bridge. Though the petition alleges that the construction company was under a contract to pave a section of the road on which the alleged defective bridge was located, it is not alleged that the company was doing any paving or any work at or near where the alleged depression existed. It was not alleged that the company had done any work on the bridge, or had contracted to do any work on it as to its repair or maintenance. The allegation in paragraph 10 of the petition, that "a legal duty was imposed on the Seaboard Construction Company, while it was in charge and control of said part of said highway for said purpose, to place, or cause to be placed, signs, flares or barricades along and near said portion of said highway, where same could be readily seen, warning anyone using or traversing on said portion of said highway in motor vehicles, of the existence of any dangerous defective bridge in such portion of such highway and to place or cause to be placed such signs, flares or barricades within reasonable proximity of where such defective bridge is located, so as to enable such travelers to slow down or stop their motor vehicles in order to avoid injuring themselves in crossing such bridge," is a legal conclusion, unsupported by alleged facts which show that the company was under any legal duty to place warning signs or notices to warn the public of the defective condition of the bridge; but it appears from the petition that this defective condition was caused by the county and not by the construction company. The fact that the company had control and charge of paving the highway, and that a portion of the highway was left open for vehicular traffic, did not impose any duty upon the company to post warning signs on the highway of the defective condition of the bridge, which had existed for a *930 long period of time prior to the time the company began its work of paving the road. Though a contractor must protect the public from dangerous conditions in the highway resulting from his work, no duty aside from statute is imposed upon him to protect the traveling public against dangerous or defective conditions of the highway caused by others. See Burroughs v. Lane Const. Corp., 77 N. H. 124 (88 Atl. 1001); Mahoney v. Sharp, 86 Ind. App. 180 (156 N. E. 566); Myers v. Sanders, 189 Miss. 198 (194 So. 300); Dunn Const. Co. v. Nail, 192 Miss. 793 (7 So. 2d 884); Vanderwall v. Goodwin, 338 Mich. 109 (60 N. W. 2d 916).
The petition failing to allege actionable negligence against Seaboard Construction Company, it was not error to sustain its general demurrers and dismiss the action as to it. See Quinn v. Ga. Power Co., 51 Ga. App. 291 (180 S. E. 246); Tollison v. Ga. Power Co., 53 Ga. App. 795 (187 S. E. 181); City of Quitman v. Elder, 55 Ga. App. 460 (190 S. E. 445); McCrory Stores Corp. v. Ahern, 65 Ga. App. 334 (15 S. E. 2d 797).
4. In an action against a resident defendant and a nonresident defendant, where the general demurrer of the resident defendant is sustained and the action dismissed as to such party, the court is without jurisdiction to pass on the merits of the nonresident's demurrers, and should dismiss the action against the nonresident for want of jurisdiction. Moore v. Atlanta Joint Stock Land Bank, 176 Ga. 697 (6) (168 S. E. 558); Thomas v. Stedham, 208 Ga. 603 (3) (68 S. E. 2d 560). Direction is given that the trial court, on return of the remittitur in this case, vacate its order sustaining the general demurrer of Charlton County, and enter an order dismissing the action against it for want of jurisdiction.
The plaintiff in error having obtained a substantial modification of the judgments of the lower court, it is ordered that Charlton County, one of the defendants in error, be taxed with both the costs in this court and the costs in the lower court for the bringing of the case to this court.
Judgments reversed in part and affirmed in part, with direction. All the Justices concur.

*932 CEREMONY AT THE PRESENTATION BY THE GEORGIA BAR ASSOCIATION OF PORTRAITS OF FORMER CHIEF JUSTICES BELL AND JENKINS

IN THE SUPREME COURT ROOM, JUNE 16, 1954

ADDRESS BY HONORABLE JOHN J. FLYNT.
Chief Justice Emeritus Jenkins, Justice Emeritus Bell, Chief Justice Duckworth, members of the Supreme Court of Georgia, Chief Judge Felton and Judges of the Court of Appeals, Justices and Judges Emeritus, visitors and guests:
Today we are assembled together to pay a deserved honor and tribute to two illustrious Georgians: Chief Justice Emeritus Jenkins and Justice Emeritus Bell.
There is a story told that at dusk on Sunday evening June 5, 1845, a coach drawn by galloping horses, lathered with sweat, dashed into the Hermitage driveway near Nashville, Tennessee. A travel-stained figure got out of the coach, leading a small boy by the hand, and entered the home of General Andrew Jackson and asked to see the General. The dustcovered traveler towered half a head above the tallest in the crowd. Only a few of the older people present recognized him as Sam Houston, former Governor of Tennessee and former President of the Republic of Texas. But such he was. The greatest of Old Hickory's captains stood motionless and speechless before the couch on which the lifeless body of his old commander lay, surrounded by soft-lighted candles. The father of the Republic of Texas drew his little boy to his side beside the corpse and said, "My son, try to remember that you have looked on the face of Andrew Jackson." Those of us who are members of the bar of this court are privileged to have known and loved the two distinguished Georgia jurists whom we of the bar honor today. Even when the youngest of us here has reached the twilight of his own life, we feel that in the hallowed garden of memory two of the most beautiful flowers there will be our recollections of having known and having served in this court under Chief Justice Jenkins and Chief Justice Bell. Even today, I have brought into this courtroom with me my 8-year old son and namesake, the third of his line to be so named. so that I, like Governor Sam Houston, may say to him, "My son, try always to remember that you have seen and known Judge Jenkins and Judge Bell."
The members of the bar of this court throughout Georgia, and I venture to say universally wherever this ceremony was known to have been planned, have given from their hearts a small contribution to purchase in the name of the Georgia Bar Association these magnificent portraits of our esteemed senior Judges. No one was asked to give more than ten dollars, and the committee in charge was instructed to return any check in excess of that amount, and ask that a ten dollar or small check be substituted in its place. News of this plan to present these portraits spread throughout the bar of Georgia like wildfire, and almost by the time the ink was dry on the letters the money was raised. Only one letter was sent *933 out to the members of the bar of this State, and within ten days' time we are happy to state that the necessary amount was over-subscribed through small gifts, as tokens of our love, to procure and frame these portraits. The balance over and above the amount of expenses will be turned over to the student loan fund commission in honor of Judge Jenkins and Judge Bell.
It is my happy privilege at this time to announce to you that the Georgia Bar Association, at one of the quarterly meetings of the its Board of Governors, passed a resolution to provide for the purchase of these portraits and the presentation of them to this court. On the committee appointed by the President of the Georgia Bar Association were Mr. William Butt, of Blue Ridge; Mr. Robert B. Troutman, Sr., of Atlanta; Mr. B. D. Murphy, of Fayetteville and Atlanta; Mr. Holcombe H. Perry, Jr., of Albany, and Justice Bond Almand of the Supreme Court of Georgia.
I would like to state at this time that these portraits which are being presented today were painted by a renowned artist, Mr. Julian Lamar, who was a kinsman of and who painted the portrait of Justice Joseph B. Lamar, of this court and also of the Supreme Court of the United States, which hangs behind the bench of this court today.
May it please the Court, we are happy to be able to meet with you today. We are grateful to this court for setting aside this hour for this ceremony. We are pleased at the large attendance of the members of the bar of this court, and we welcome such visitors and guests as may be present.
Now, ladies and gentlemen, it is my pleasure to present to you an outstanding lawyer of South Georgia, a member of the Albany Bar, Mr. Holcombe H. Perry, Jr., of Albany, who will make the formal presentation to this court of the portrait of Judge R. C. Bell.

ADDRESS BY HONORABLE HOLCOMBE H. PERRY, JR.
May it please the Court: This is indeed a happy occasion. It is my privilege and distinct pleasure to present to this Court, to be hung in its courtroom, a portrait  the likeness of a man and a Judge. He is not just an ordinary man nor an ordinary Judge.
The record shows that he has been a practicing lawyer, a Solicitor-General, a Judge of the Superior Court, a Judge of the Court of Appeals, a Justice, Chief Justice and now Justice Emeritus of this, the Supreme Court of this State.
This is most assuredly an outstanding record of public service. Few men have been privileged to serve our State in such high offices and for such a long period. None have served with more conscientious fidelity and distinction. The esteem and respect of the practicing members of the Bar is the highest reward that can come to a Judge. This man has that esteem, and deservedly so. He is loved, respected and admired by all members of the Bar who have had the privilege of knowing him. His virtues are numerous  kind, gentle, amiable, friendly, considerate, humble and lovable. These express his dominant personal characteristics. To paraphrase an excerpt from Shakespeare's Julius Caesar, "His life has been gentle and the elements so mixed in him that nature might stand up and say to all the world. `This is a man.'"
*934 As a Judge, his written opinions which grace the reports of this Court and the Court of Appeals are masterpieces of research, scholarship and learning, and speak more eloquently of his industriousness and outstanding ability than mere words can describe.
Socrates said that four things belong to a Judge: to hear courteously, to answer wisely, to consider soberly and to decide impartially. This man unquestionably measures up in the fullest to these qualifications. We, as lawyers, are primarily interested in the advancement of the science of jurisprudence, promoting the administration of justice and upholding the honor of the profession of the law. We honor this man because his professional life has been dedicated to these principles. It is great men of his character and ability who as Judges build for us and for posterity in our judiciary a bulwark that will withstand the onslaughts against our way of life and our freedoms. His services have immeasurably strengthened and made more imperishable the judicial system under which we live.
We are pleased that this is not a memorial service. We feel that gratitude and praise that comes only after the grave comes too late. It gives us genuine pleasure to be able to continue to show our love and respect for him during his lifetime and to express to him a true appreciation of his career. The presentation of this portrait is symbolic of our high esteem and affection for him and of the real respect in which we regard his contribution to law and justice. It is our hope that we may have the privilege to continue for many years to enjoy his warm personality and his friendly smile. May his portrait serve as an inspiration to all who enter here to greater effort to improve the administration of the law.
It is now my pleasure on behalf of the Georgia Bar Association which has sponsored this occasion and those of its members who have contributed to its expense, to present to this Court a portrait of the man about whom I have been talking, the Honorable R. C. Bell, Justice Emeritus of the Supreme Court of Georgia.
MR. FLYNT: May it please the Court, it is my pleasure to introduce and present to you Mr. B. D. Murphy, of the Fayetteville and Atlanta Bars. Mr. Murphy is a man who needs no introduction and no presentation before this or any other appellate court in this region. He is in my opinion one of the outstanding lawyers of Georgia and of the United States. It is my pleasure at this time to present Mr. B. D. Murphy, who will make the formal presentation to this court of the portrait of Chief Justice Emeritus Jenkins.

ADDRESS BY HONORABLE B. D. MURPHY.
May it please the Court: It is my privilege, on behalf of the Georgia Bar Association, to present to the Court this portrait of Chief Justice Emeritus William Franklin Jenkins.
It has been provided by the lawyers of Georgia, and this ceremony of presentation and acceptance has been instituted, that our admiration, respect and affection for Judge Jenkins may be made known to him and may be evidenced throughout all the years to come on the walls of this sanctuary of justice.
Some years ago, when I was his secretary ("shorthand writers," the law then called us) Judge Jenkins asked me to write his obituary  at the *935 proper time, of course. In obedience to a principle he himself once announced to me  that one will agree to do almost anything if he is asked long enough in advance, I agreed; the agreement being contingent, as a matter of necessity, upon my own availability at the proper time. This is in no sense an obituary, for I am come to praise Ceasar, not to bury him. However, some statement of that nature would seem to be in order.
Judge Jenkins was elected to the Court of Appeals in the free-for-all of 1916, when the number of Judges was increased from three to six. Walter F. George and Roscoe Luke were elected at the same time. He served on the Court of Appeals exactly twenty years  from January 1, 1917, to December 31, 1936.
He was elected an Associate Justice of this Court in 1936 to succeed Judge Price Gilbert, who did not offer for reelection. Judge Jenkins became Chief Justice December 2, 1946, succeeding Judge Bell, who declined reelection as Chief Justice. He resigned September 10, 1948, and was appointed Chief Justice Emeritus on that day. His active judicial service thus covered a period of just a little less than thirty-two years.
(I think he also claims to have presided, pro hac vice, as Judge of the Superior Court of Putnam County on one occasion, but I have not been able to substantiate that claim.)
From McMillan v. Heard National Bank, 19 Ga. App. 148, decided January 23, 1917, the first case in which Judge Jenkins participated, to Willis v. The Arlington Corporation, 204 Ga. 258, the last case in which he presided, the Supreme Court and the Court of Appeals disposed of a total of 23,184 cases during his judicial tenure.
(His very first opinion, in the McMillan case, was written in a judicial style seldom achieved except from long experience  he referred to the losing lawyer as "the learned counsel for the plaintiff in error.")
It would be very difficult to list the leading cases written by Judge Jenkins as a Judge of the Court of Appeals and as a Justice of this Court, or to evaluate his contribution to the law. Bench and Bar are indeed fortunate that the product of his genius will be always available.
If I were privileged to name the case I think Judge Jenkins regarded as embodying his best work, I would say Central of Georgia Railway Company v. Larsen, 19 Ga. App. 413; but if a choice was required of me, I would have to say that a final selection from so great a number could not be made.
I believe every headnote he wrote stated a complete rule of law, and could be lifted out of its context without impairment.
He may have reached erroneous conclusions in some cases, but I do not believe he ever wrote a really poor opinion. It never occurred to him to do less than his dead level best in any case, nor to leave undecided any point relied upon by counsel.
I will not repeat anything Holcombe Perry has said in presenting the portrait of Judge Bell, but I would like to say that it seems to me fitting and appropriate to honor these great judges together. They served together on the Court of Appeals and they served together on the Supreme Court. I think each of them was a better judge because of the other, and I am sure each of them is a better man because of the abiding friendship of the other.
To them the Bar is indebted for their splendid record of judicial service, *936 for their intelligent consideration of cases, for their painstaking care to state the law fairly and accurately, for their ability to make the law a living, vital thing, and, above all else, for their devotion to duty, their loyalty to the Court and to the principles of justice for which it stands.
The lawyers from practically every county in Georgia who contributed to this effort ask the Court to accept this portrait of its distinguished and beloved former Chief Justice.

ACCEPTANCE FOR THE SUPREME COURT BY CHIEF JUSTICE

W. H. DUCKWORTH.
Mr. President and members of the Georgia Bar Association: On behalf of the membership of the Supreme Court, I am happy to accept from the members of the Georgia Bar Association these excellent portraits of Judges Bell and Jenkins. This action by the lawyers of Georgia, showing your love, respect, and admiration for these most worthy former judges, reflects a spirit of loyalty and respect that characterizes the general attitude of our lawyers toward all judges. It is a mighty tower of strength for all judges, and contributes immeasurably to the accomplishments of your judges. Having had the honor and enjoyed the privilege of serving many years on this court with these two great judges, where I benefitted by their wise counsel and was made happy by their warm personal friendship, I am especially and peculiarly moved by this ceremony. No bigger legal minds, no warmer human hearts, no greater judicial courage, can be found in any man who ever occupied a position on this court than is found in these two men. Both Judge Bell and Judge Jenkins stand out as giants in the entire history of the judiciary of Georgia. I have been greatly benefitted both as a lawyer and as a judge from having associated with them. I am simply overwhelmed with joy on this occasion.

RESPONSE BY FORMER CHIEF JUSTICE R. C. BELL.
May it please the Court, Mr. Flynt, President of the Georgia Bar Association, Mr. Perry, Mr. Murphy, and other members of the Bar Committee, other attorneys, Judges, friends.
The gracious remarks of all who have spoken have greatly touched me and are most deeply appreciated.
However, I can hardly realize that this is an actual occasion instead of a wonderful and very beautiful dream or phantasy.
Speaking solely in reference to the portrait of myself  when I first learned, a short time ago, of what the officers and members of the Georgia Bar Association had planned, I experienced absolutely the greatest and most complete surprise of my life.
How could it ever happen that the Georgia Bar Association, or the lawyers of Georgia, would think of, plan, and carry out such an undertaking, in view of a record so imperfect and inadequate? Nevertheless, not my opinion, but the appraisal and judgment of the Bar Association must control in such a matter, and it is not for me to reason why.
Accordingly, with a deep sense of unworthiness and humility, I accept, in profound and everlasting gratitude, this invaluable token of their esteem and approval.
*937 Perhaps I may in some measure describe my feelings at the present moment by stating that they are, as I would imagine, similar to the feelings of one receiving an honorary degree from some noble institution.
And really, is that not the present case? For the Georgia Bar Association is indeed and in truth a great and noble institution, now even an educational institution, if you please; and my love for it and its members, because of the work it has done and continues to do toward improving our laws and procedures, ever seeking higher standards of justice, and because of the memories which its very name inspires, is like unto the love one may have for his alma mater. And, then as we hear acceptance pronounced by our own Supreme Court, through our own Chief Justice, we cannot but feel as though it were an approving, official seal, indelibly impressed upon this act and deed of the Bar Association, and its members.
It has been said that gratitude is the heart's memory. Like other emotions, or most of them, it cannot be measured by any known standard of weight or measurement. Nor can it be expressed or described in words. One descriptive term merely calls for another, ad infinitum. I only wish it were otherwise, but, regardless, of other allusions here made, this portrait is most greatly prized not because it identifies a particular individual and may help to prolong memory of him, but rather because, wherever it may be placed from time to time, it will there exist as a definite affirmation of the respect, esteem, and more than generous appraisal bestowed by the lawyers of Georgia upon one who simply served to the best of his ability and understanding.
The assurance "well done," here so graciously given, not only furnishes a never-to-be-forgotten reward; but, additionally, as you must know, it is a moving incentive, stimulating the desire to be of useful service, when and wherever possible.
One particular circumstance I do want to mention before closing, and that is, I am so happy that these two portraits will, as I hope, link together forever the names of Jenkins and Bell. We have worked together for nearly a third of a century, during which time he has been my loyal and beloved friend and confidant; and so, it is to me a deeply gratifying occurrence to be associated in similar situation here, with so just and learned a judge, so brilliant and profound a scholar, so great and good a man.
My sincerest thanks to the Court, to all officers and members of the Bar Association, and to every one who participated in any way toward bringing about this event.

RESPONSE BY FORMER CHIEF JUSTICE W. F. JENKINS.
May your Honors please, Mr. Chief Justice and Justices, the Chief Judge and Judges of the Court of Appeals, Mr. President and members of the Georgia Bar Association, and other friends.
I would wish this response to be as brief, almost, as a solemn bow of gratitude, and being conscious of my unworthiness, imbued with as great a sense of humility as anyone in this position should feel.
I can understand and concur in what has been said with respect to Judge Bell; but deserve no credit for that, as but to know him is to hold him in honor and affection. He is able, learned, modest, and beloved.
*938 As for myself, I confess to being jittery; since the only conceit I have ever acknowledged is that I have been conceited enough to believe that I have never been the least bit conceited. It therefore behooves me to hold fast to the only virtue I have ever thought was mine. But the kind, though it must be partial, words which have been spoken, and this great thing which the lawyers of Georgia have done, not only overwhelm the two recipients of the honor, but have quickened the heart throb of each and every member of their families, all of whom with the strength to let them come are here today.
What I see in the eventide of a long, long day, is not the darkening shadows which in the natural order must be gathering closer now, but am conscious only of the bright and iridescent glow that lights a friendly and prophetic West, as I journey on to find it.
In closing, whether it should be my privilege to see you many times again, or whether this should be a valedictory, I wish to give a personal and continuing greeting to my former comrades on the Courts and to my former comrades, the lawyers of Georgia. That message is this: you are still my comrades in mind and heart. And, though but a private in the Spiritual realm, I would add this for all of you, as the best of all good wishes: May God be with you in all your ways and through all your days.
CHIEF JUSTICE DUCKWORTH: This concludes the program, and adjournment is in order. This Court has never held a more significant or important session than this one.